HERRICK, FEINSTEIN LLP
*Proposed Attorneys for the Debtors and Debtors*
*in Possession*
Stephen B. Selbst
Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
hhuynh@herrick.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| NATIONAL EVENTS HOLDINGS, LLC, *et al.,* | Case No. 17-11556 (JLG) |
| | (Motion for Joint Administration Pending) |
| Debtors. | |

----------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364; (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING**

The above-captioned debtors (the "Debtors"), by their proposed counsel, Herrick, Feinstein LLP, as and for their motion (the "Motion") for entry of an interim order substantially in the form annexed hereto as Exhibit A (the "Interim Order"), and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"): (i) authorizing the Debtors to enter into a debtor-in-possession financing facility (the "DIP Loan") with Falcon Strategic Partners IV, LP, (the "DIP Lender") pursuant to the terms of the Interim Order (ii) granting liens and superpriority administrative expense status in connection with the DIP Loan pursuant to 11 U.S.C. § 364; (iii) authorizing the Debtors to use cash collateral pursuant to 11 U.S.C. § 363; and (iv) scheduling a final hearing with respect to the relief requested herein pursuant to Rule 4001

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1.      This Motion is a request to approve a commercially reasonable lending facility between debtors in possession and their existing prepetition secured lender, who has agreed to make a debtor-in-possession loan on the terms specified in the Interim Order and to permit use of cash collateral.  The Debtors submit that the proposed financing, which for the purposes of this Motion includes the authority to use cash collateral, is essentially a continuation of a pre-petition lending arrangement with the Debtors' Prepetition Lender.

2.      The proposed financing is advantageous to the Debtors because it provides critical debtor-in-possession financing during the pendency of the Debtors' chapter 11 cases.  The need for the financing is apparent, the terms are reasonable and the Debtors respectfully submit that the Motion should be granted.

3.      Following is a summary of the material terms of the Debtors' request for authority, on an interim and final basis, to enter into the DIP Loan and to use cash collateral:

## DIP LOAN

**Commitment**:        Up to $485,000 (the "Commitment").

**Use of Proceeds**:   (A) working capital and other general corporate purposes of the Debtors during the Chapter 11 Cases (excluding the repayment of any prepetition indebtedness), (B) adequate protection payments, solely as provided for in this Interim Order, (C) the permitted payment of costs of administration of the Chapter 11 Cases, (D) repayment of the Emergency Pre-Filing Advance, (E)  payment of interest, fees, costs, and expenses related to the DIP Facility as set forth herein and in the DIP Documents (including the fees and expenses of the DIP Lender's advisors), (F) payment of such prepetition fees, costs, and expenses as consented to by the DIP Lender and approved by the Bankruptcy Court, including prepetition expenses approved by the Bankruptcy Court in connection with the Debtors' "first day" motions, and (G) payment of such other amounts permitted by the Approved Budget (including Permitted Variances, as defined below).

**Interest**:          11 % per annum.

HF 11504030v 2 #18887/0001

**Fees:**               None.

**Default Interest**:    15% per annum.

**Term**:               The DIP Loans shall mature on the date (the "***Maturity Date***") that is earliest of (i) 30 days after the date hereof of entry of the Interim Order, if this Court does not enter the Final Order in a form acceptable to the DIP Lender in its sole discretion; (ii) 90 days after the Petition Date; (iii) the date on which a chapter 11 plan of reorganization becomes effective; (iv) upon entry of an order dismissing or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (v) upon entry of an order appointing a trustee or examiner with respect to any of the Chapter 11 Cases; (vi) upon an uncured material breach of any representation, warranty, or covenant or any other provision of the Interim Order or (vii) the occurrence of an Event of Default (as defined).

**Conditions
to Lending:**           The Interim Order shall have been entered on or before 5:00 p.m. on June 9, 2017, in form and substance acceptable to the DIP Lender in its sole discretion; the DIP Lender shall have agreed to an Approved Budget in its sole discretion and each such borrowing under the DIP Facility shall be in accordance with the terms of such Approved Budget; no Event of Default shall have occurred; all "first day orders" entered by this Court shall be acceptable to the DIP Lender in its sole discretion; the Debtors shall be in compliance with all terms, provisions, conditions, and covenants contained herein; each of the representations and warranties contained herein remain true and correct; and each Debtor shall have executed and delivered a promissory note to the DIP Lender in the principal amount of the Maximum Amount.

**Collateral**:         The DIP Loan shall be secured by all assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, before or after the Petition Date, including, without limitation: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (iii) all funds in any deposit account, securities account, or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (iv) all accounts and other receivables (including those owed to the Debtors generated by intercompany transactions); (v) all contracts and contract rights; (vi) all instruments, documents, and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, equipment, inventory, and fixtures; (ix) all real property interests; (x) all interests in leaseholds, (xi) all franchise rights; (xii) all patents, trade names, trademarks (other than intent-to-use trademarks), copyrights, and all other intellectual property; (xiii) all general intangibles; (xiv) all capital stock, limited liability company interests, partnership interests, and financial assets; (xv) all investment property; (xvi) all supporting obligations; (xvii)

all letters of credit issued to the Debtors and letter of credit rights; (xviii) all commercial tort claims; (xix) all other claims and causes of action and the proceeds thereof (including, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof (subject to entry of the Final Order)); (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts, and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other goods, assets, or properties of the Debtors, whether tangible, intangible, real, personal, or mixed; and (xxii) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to such Debtor from time to time with respect to any of the foregoing.

**Priority and Liens**:   To secure the DIP Obligations, immediately upon, and effective as of entry of this Interim Order, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:

> (i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected, and non-avoidable security interest or lien as of the Petition Date;

> (ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically, and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph) that is subject to liens that the DIP Lender has acknowledged in writing to be permitted liens;

> (iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral securing the Prepetition Secured Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Lender shall be senior to the Prepetition Liens and the Adequate Protection Liens granted hereunder; and

> (iv) solely to the extent of the Diminution in Value of the interest of the Prepetition Agent and the Prepetition Lender in the Prepetition Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable, and automatically perfected postpetition liens and security interests in the DIP

4

Collateral (the "<u>Adequate Protection Liens</u>"), which liens shall be (x) junior only to the DIP Liens and the Carve-Out, and (y) senior in priority to all other liens, including the Prepetition Liens.

**Carve-Out:** Means the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (b) all allowed and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, and the Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (each, a "<u>Professional</u>") at any time before or on the first business day following termination of the DIP Loan, whether allowed by the Court prior to or after such termination, provided, however, that in no event shall any such fees and expenses exceed the amount set forth in the Approved Budget for any such Professional, less any amounts previously paid to any such Professional; and (c) all reasonable fees and expenses up to $15,000 incurred by a trustee under section 726(b) of the Bankruptcy Code.

**Event(s) of Default:** (A) The occurrence of any of the events or circumstances set forth in Sections 9.01(a)-(f) or (i)-(n) of the Prepetition Credit Agreement; (B) the Debtors' failure to comply with any of the terms set forth in the Interim Order, including without limitation failure to comply with the Approved Budget (including the Professional Fee Accrual Schedules, defined below) after giving effect to any Permitted Variances; or (C) the Debtors' failure to collect cash proceeds during any rolling 4-week period of at least eighty percent (80%) of the "Total Inflows" included in the Approved Budget.

**Default Remedies:** Upon the occurrence and during an Event of Default: upon the occurrence and during the continuance of any Event of Default under the DIP Documents, all rights and remedies provided for herein, and to take any or all of the following actions without further notice, motion, or application to, order of, or hearing before, this Court: (1) immediately terminate the Debtors' rights, if any, under this Interim Order to use Cash Collateral; (2) cease making any DIP Loans to the Debtors (but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations); (3) declare the individual commitments of the DIP Lender to make further DIP Loans to be terminated; (4) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtors; (5)  freeze monies or balances in the Debtors' accounts; (6)  immediately set off any and all amounts in accounts maintained by the Debtors against the DIP Obligations, enforce all rights and remedies against the DIP Collateral for application toward the DIP Obligations, and otherwise proceed to protect or enforce all rights and remedies of the DIP Lender under this Interim Order, any of the other DIP Documents, or applicable law; and (7) take any other actions or exercise any other rights or remedies permitted under this Interim Order or the Final Order, as applicable, the other DIP Documents, or applicable law to effectuate the repayment of the DIP Obligations; <u>provided</u>, <u>however</u>, that prior to the exercise of any right or remedy described in clauses (5), (6) or (7) of this paragraph, the DIP Lender shall provide five (5) business

5

days' written notice of its intent to exercise its rights and remedies to the Debtors, counsel to any Committee, and the U.S. Trustee.

4.      In the event of any discrepancy between the summary description of the DIP Loan contained in the Motion and the terms of the Interim Order or the Final Order, as the case may be, the terms of the Interim Order or the Final Order, as applicable, shall control.

## INTRODUCTION

5.      On June 5, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court, and orders for relief under section 301 of the Bankruptcy Code were entered in these cases (the "Chapter 11 Cases").  A motion directing the joint administration of the Chapter 11 Cases is pending.

6.      The Debtors have been authorized to remain in possession of their property and to continue in the operation and management of their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      No official committee of unsecured creditors has yet been appointed by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") in the Chapter 11 Cases.

## BACKGROUND

8.      The Debtors operate together a ticket broker and wholesale distributor of tickets for sporting and theatrical events that was formed in 2006.  The Debtors provide ticketing services for all concert, theater and sporting event tickets, as well as various V.I.P. hospitality packages that deliver exclusive access to big name events, including hotels, celebrity meet and greets and exclusive parties.

HF 11504030v.2 #18887/0001

9.      On May 31, 2017, Jason Nissen ("Nissen"), the former chief executive officer of the Debtor, was arrested and charged by the Federal Bureau of Investigation (the "FBI") with allegedly defrauding victims of at least $70 million through what the FBI characterized as a Ponzi scheme. According to the complaint filed in the United States District Court for the Southern District of New York (the "Complaint"), Nissen "represented to victims that he would use money lent to him and his companies by victims to purchase bulk quantities of premium tickets to sporting and entertainment events…However…Nissen used the victims' money in large part to repay other victims and enrich himself."

10.      According to the Complaint, to perpetuate his fraud, Nissen presented to his victims falsified financial documents and inflated accounts receivable ledgers as purported proof that their money was being used to purchase tickets for resale.

11.      The Complaint further alleges that on or about May 7, 2017, Nissen admitted to one of his victims that he had been operating a Ponzi scheme, and that on May 10, 2017 he made a similar acknowledgement to another victim.

12.      The Debtors learned of Nissen's fraudulent activities on or about May10, 2017. Nissen was terminated on that date and on May 11, 2017, the Board of Managers of National Events Holdings, LLC retained RAS Advisors, LLC, a nationally-known crisis management and turnaround firm. Timothy Puopolo of RAS has served as Chief Restructuring Officer since that date.

13.      Since RAS has been retained, the CRO's principal activities have consisted of (1) liquidating the Debtors' inventory of saleable tickets, (2) reducing operating expenses to a bare minimum, (3) ensuring the integrity of the Debtors' remaining assets, and (4) investigating potential assets and recoveries, such as amounts due from counterparties.

HF 11504030v.2 #18887/0001

14.     Nissen's fraud is still the subject of a continuing criminal investigation by the United States Attorney for the Southern District of New York (the "US Attorney Investigation"). Since May 10, 2017, the Debtor has fully cooperated with the US Attorney Investigation by responding to subpoenas that have been issued, providing bank and financial records and responding to inquiries. Because the US Attorney Investigation has not concluded, the Debtor anticipates that it will have continuing response obligations.

15.     As indicated above, the Debtors are well along in the process of winding down operations. As of June 2, 2017, the Debtors have reduced their full-time staff to six persons, most of whom are primarily or exclusively involved in the financial side of the business. In May 2017 the Debtors closed their Hollywood, California office and deactivated their website.

16.     As indicated above, the Debtors are now concentrating on disposing of their remaining ticket inventory and pursuing their accounts receivable.  The last remaining event for which the Debtors anticipate material sales of tickets is the 2017 US Open. The Debtors previously purchased a substantial bloc of tickets for this popular Grand Slam tennis event, and anticipate being able to resell those tickets at a profit. The Debtors also own a 40% interest in Concierge Live, LLC, a ticket management software company, and a 50% interest in Winter Music Festivals LLC, a company that produces concert events. The Debtors are currently evaluating the best methods for maximizing the value of those assets.

## PREPETITION FUNDING OF THE DEBTORS' OPERATIONS

17.     Pursuant to (a) that certain Purchase Agreement dated July 6, 2015 (as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof, including on August 20, 2015, November 23, 2015, January 13, 2016, April 11, 2017 (the "Fourth Amendment"), and June 5, 2017 (the "Fifth Amendment"), the "Prepetition Credit Agreement"), among Debtors National Events Intermediate, LLC ("NECO"),

8

National Events Holdings, LLC ("Holdings"), and "Subsidiary Guarantors" National Event Company II, LLC, National Event Company III, LLC, and World Events Group II, LLC, Jason Nissen, Falcon Strategic Partners IV, LP (in such capacity, the "Prepetition Lender"), FMP Agency Services, LLC (in such capacity, the "Prepetition Agent"), the Prepetition Lender agreed to purchase (x) up to $25,000,000 in aggregate original principal amount of the 11% Senior Secured Notes due 2020 of NECO, (y) up to $15,000,000 in aggregate original principal amount of the 8% Senior Unsecured PIK Notes due 2022 of NECO, and (z) 48 Class A Units representing membership interests in Holdings, with the Fourth Amendment dated April 11, 2017, providing for an additional tranche of Senior Secured Notes in the amount of $4,000,000, and the Fifth Amendment providing emergency pre-filing funds in the amount of $108,572 on the Petition Date to enable the filing of these Chapter 11 Cases (the "Emergency Pre-Filing Advance"), and (b) the other Financing Documents (as defined in the Prepetition Credit Agreement and, together with the Prepetition Credit Agreement, the "Prepetition Loan Documents"), the Prepetition Lender provided fully perfected secured loans (the "Prepetition Secured Loans") to and for the benefit of the Debtors in the amount of $29,000,000, and senior unsecured loans (the "Prepetition Unsecured Loans") in the aggregate amount of $15,000,000. As of the Petition Date, the Debtors were indebted to the Prepetition Lender, without defense, counterclaim, or offset of any kind, in respect of (1) the Prepetition Secured Loans made in the aggregate outstanding principal amount under the Prepetition Loan Documents of not less than $29,108,572, plus accrued and unpaid interest and fees with respect thereto (which, as of June 5, 2017, was not less than $681,111.11, and (2) Prepetition Unsecured Loans made in the aggregate outstanding principal amount under the Prepetition Loan Documents of not less than $15,000,000, plus accrued and unpaid interest and fees with respect thereto (which, as of June 5,

HF 11504030v.2 #18887/0001

2017, was not less than $2,231,214.20 (collectively, the "Prepetition Obligations"; if solely in connection with the Prepetition Secured Loans, collectively, the "Prepetition Secured Obligations", and if solely in connection with the Prepetition Unsecured Loans, collectively, the "Prepetition Unsecured Obligations"). A copy of the Prepetition Loan Documents is attached hereto as Exhibit B.

18.      To secure the Prepetition Obligations related to the Prepetition Secured Loans, the Debtors granted to the Prepetition Lender for the benefit of the Prepetition Lender security interests in and liens upon (the "Prepetition Liens") all "Collateral" under and as defined in the Prepetition Loan Documents (the "Prepetition Collateral").

19.      The Debtors believe that all cash of the Debtors wherever located on the Petition Date represented either proceeds of loans or other financial accommodations from the Prepetition Lenders to the Debtors or proceeds of Prepetition Collateral.  Pursuant to the Prepetition Loan Documents, the Debtors believe that the Prepetition Lender has a first, valid, and perfected security interest in and lien on all of the Debtors' cash, and that those funds constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

20.      The Debtors believe that the Prepetition Lender's Liens constitute valid, binding, enforceable, and perfected first-priority liens subject only to liens described in or otherwise permitted by the Prepetition Loan Agreement, and are not subject to avoidance or subordination that are valid, binding, enforceable, and in existence on the Petition Date and the Carve-Out (as hereinafter defined) in accordance with the provisions of this Interim Order) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.   The Debtors believe: (1) that the Prepetition Debt constitutes legal, valid, and binding obligations of the Debtors, enforceable in accordance with the terms of the Prepetition Loan Documents (other than in respect of the stay of

HF 11504030v.2 #18887/0001

enforcement arising from Bankruptcy Code section 362); (2) that no offsets, defenses, or counterclaims to the Prepetition Indebtedness exist; and (3) that no portion of the Prepetition Debt is subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

21.    An immediate and critical need exists for the Debtors to obtain funds in order to continue the wind-downs of their businesses.  Without such funds, the Debtors will not be able to pay their payroll, pay other direct operating expenses, or obtain goods and services needed to carry on their businesses during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates, creditors, customers, and employees.  At this time, the Debtors' ability to finance their operations and the availability to them of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the preservation and maintenance of the value of the Debtors' estates.  The Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) or secured debt as described in section 364(c)(2) or 364(c)(3) except as set forth herein.

22.    On June 5, 2017, the Prepetition Lender provided the Emergency Pre-Filing Advance in the principal amount of $108,572 through its purchase of the Senior Secured Note, Series C, the proceeds of which were used to fund the Debtors' operating expenses and professional retainers. Pursuant to the terms of the Interim Order, the Prepetition Lender seeks to have the amount of the Emergency Pre-Filing Advance repaid from the proceeds of the DIP Loans.

11

23.     The Prepetition Lender asserts, and the Debtors believe, that substantially all of the Debtors' assets are subject to the Prepetition Lender's Liens.  The Prepetition Lender has objected to any further use of the Prepetition Collateral by the Debtors, except under the terms of the Interim Order assuring that the liens and the various claims, superpriority claims, and other protections granted pursuant to this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated by this Interim Order.

24.     Subject to the provisions of the Interim Order, the DIP Lender has agreed to provide postpetition financing to permit the Debtors to implement a restructuring.  The Debtors are hereby authorized to borrow money pursuant to the DIP Loan Documents (all loans, advances and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the DIP Lender, the "DIP Loans"), and to perform their obligations hereunder and thereunder, solely in accordance with, and subject to, the terms of the Interim Order, in compliance with (on a line-by-line basis) and for the purposes of funding those expenses set forth in the budget attached as Exhibit C hereto (as may be modified or supplemented from time to time without further order of this Court by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the DIP Lender, and the Debtors agree and a copy of which is provided to any committee appointed by the Court, the "Budget").

### THE REASONS WHY EMERGENCY INTERIM RELIEF IS REQUIRED

25.     The Debtors' respectfully submit that without immediate access to the DIP Loan, the Debtors' wind-down efforts will be irreparably harmed.  As indicated in the Budget, over the

12

course of the next few weeks, or until such time as this Court can schedule a final hearing on the Motion, the Debtors will either be accruing or paying substantial expenses, including payroll and payroll-related expenses. During that period, the Debtors predict that they will need to borrow $250,000 from the DIP Loan to meet their obligations set forth in the Budget (including the repayment of the Emergency Prefiling Advance). Even if given the authority to use all available cash collateral, the Debtors' projected sales during this period, which would in any event constitute the Prepetition Lender's cash collateral, will not be sufficient to meet these essential obligations as they become due. The Debtors propose that all loans and advances authorized on an interim basis be subject to the terms of the DIP Term Sheet generally and the Interim Order specifically.

26.     The pre-petition financing arrangement which the Debtors negotiated with the Prepetition Lender was negotiated at arms' length and contains terms favorable to the Debtors. The DIP Loan was likewise negotiated with the DIP Lender at arms' length and contains terms favorable to the Debtors. Based upon the Debtors' familiarity with the market for this type of loan, and the current state of the credit markets regarding debtor in possession loans, they believe that it is unlikely that there is any other lender, given the time limitations and exigencies, which could offer more favorable terms.

27.     The Debtors cannot operate in bankruptcy without access to the liquidity provided by the DIP Loan. The Debtors believe that if the relief sought herein is granted, it will provide the Debtors with the opportunity to pursue their wind down strategy and to preserve their assets and business for the benefit of their creditors and estates.

HF 11504030v 2 #18887/0001

## SPECIFIC RELIEF REQUESTED

28.     This Motion is brought pursuant to sections 361, 363(b) and 364(b) and (c) of the
Bankruptcy Code, and *inter alia*, Bankruptcy Rule 4001.  The Debtors seek entry of the Interim
Order (and ultimately the Final Order) authorizing the Debtors to borrow from the DIP Lender
and to use cash collateral, pursuant to the terms of the DIP Loan substantially, and without
material change, in the form annexed hereto and entry of a virtually identical Final Order.

29.     Pursuant to sections 364(c)(1) and (2) of the Bankruptcy Code, this Court is
authorized to permit a debtor to obtain post-petition credit entitled to superpriority administrative
expense status and secured by a first security interest in and lien on property of the estate,
provided a debtor is otherwise unable to obtain unsecured credit allowable under section
363(b)(1) of the Bankruptcy Code as an administrative expense and provides adequate protection
to existing lienholders.  Under the Interim Order, the DIP Lender's and post-petition liens will
prime the pre-petition liens of the Prepetition Lenders with the consent of the Prepetition Lender
on the terms set forth in the Interim Order.

30.     Pursuant to, *inter alia*, sections 363 and 361 of the Bankruptcy Code, the Court
may authorize the use of cash collateral, provided that all entities with an interest therein
received adequate protection.

31.     The Debtors propose to obtain post-petition credit from the DIP Lender and to use
cash collateral to pay ordinary and necessary operating expenses.  The Debtors' proposed
operational expenditures relate to payment for outside services and payroll and payroll-related
expenses.  At the current time, no material capital expenditures are contemplated.

32.     As demonstrated herein and in the Budget, and as will be shown at any
evidentiary hearing held with respect to the Motion (if required), the financing, borrowing and

14

use of cash collateral is necessary, appropriate and, indeed, essential to the Debtors' reorganization efforts. It is, moreover, given the Debtors' circumstances and the time constraints the most favorable financing - if not the only financing - currently available to the Debtors. Absent the ability to borrow, the Debtors will be unable to support their operations and reorganize their business.

## AUTHORITY FOR THE REQUESTED RELIEF

33.     It is vital to the success of the Debtors' wind-down efforts that access to cash collateral and DIP Loan borrowings be obtained immediately. Absent the immediate ability to borrow and utilize cash collateral, the Debtors face a risk of severe disruption to their wind-down efforts and irreparable harm to their assets.

**A.    The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(c) of the Bankruptcy Code**

34.     The Debtors propose to obtain financing under the DIP Loan by providing security interests and liens (and super priority and administrative claims) as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code provides as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

HF 11504030v.2 #18887/0001

35.    Thus, the statutory requirement for obtaining postpetition credit under section 364(c) is a finding that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must demonstrate a reasonable effort to obtain other sources of financing); In re Garland Corp., 6 B.R. 456, 461 n. 11 (1st Cir. BAP 1980) (secured credit under section 364 is authorized upon showing that unsecured credit cannot be obtained); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa.), modified on other grounds, 75 B.R. 553 (1987) (debtor must prove that it was unable to obtain unsecured credit pursuant to 11 U.S.C. § 354(b)).

36.    Courts have articulated a three-part test to determine whether financing should be authorized under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (b)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dept. Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

37.    Prior to the Petition Date, the Debtors, through RAS, sought to locate financing on more favorable terms, but the Debtors were unable to locate such financing.  Given the Debtors' circumstances, they determined that postpetition financing on an unsecured basis would be unobtainable.

16

HF 11504030v.2 #18887/0001

38.    The Debtors believe that the DIP Loan will provide adequate time and resources for the Debtors to operate while they complete an orderly wind-down.  If, however, the Debtors were unable to obtain debtor in possession financing, they would be unable to complete that process.

39.    Lastly, given the Debtors' current circumstances, the Debtors believe that the terms of the DIP Loan are fair, reasonable and adequate.  Based on the foregoing, the incurrence of debt under the DIP Loan and the granting of super-priority administrative claims is appropriate under the circumstances.

## B.    The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(d) of the Bankruptcy Code and for Using Cash Collateral Under Section 363 of the Bankruptcy Code

40.    If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may nonetheless obtain credit secured by a senior or equal lien (a "priming lien") on property of the estate that is already subject to a lien under section 364(d).  Section 364(d)(1) of the Bankruptcy Code provides:

> (d)(1)   The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>     (A) the trustee is unable to obtain such credit otherwise; and
>
>     (B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

41.    As explained above, the financing under the DIP Loan is the Debtors' only financing option with terms comparable to those offered by the DIP Loan, and the postpetition liens are an essential part of the protections provided to the DIP Lender thereunder.

17

42.      Unless a creditor consents, the use of cash collateral is conditioned upon the adequate protection of the creditor's interest. <u>See</u> 11 U.S.C. §§ 363(c)(2), (e).  The Bankruptcy Code does not explicitly define "adequate protection."  However, section 361 suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property; (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. <u>See</u> 11 U.S.C. § 361.  The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide a secured party. <u>See</u> <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994).

43.      The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. <u>See</u> <u>495 Cen. Park</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor in the value of its interest [during the chapter 11 case]."); <u>In re Becker Indus. Corp.</u>. 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); <u>In re Hubbard Power & Light</u>, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  Accordingly, courts have discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide a secured party. <u>See</u> <u>Beker Indus.</u>, 58 B.R. at 736; <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994).

44.      The Debtors believe that the DIP Lender would not have agreed to provide the DIP Loan absent the protections afforded to them.  The Debtors believe, in their reasonable business judgment, that the benefits of the DIP Loan outweigh the risks associated with having no access to continued funding, or in seeking to obtain the use of cash collateral on a non-consensual basis.

18

**C.     No Comparable Alternative to the DIP Loan Is Currently Available, and the DIP
Loan is in the Best Interests of the Debtors' Estates**

45.     The Debtors have made a concerted, good-faith effort to obtain credit on the most
favorable terms that are available.  The proposed terms of the DIP Loan are fair, reasonable and
adequate given the Debtors' circumstances.  The terms and conditions of the DIP Loan were
negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the
circumstances.  Accordingly, the DIP Lender should be accorded the benefits of section 364(e)
of the Bankruptcy Code in respect of such agreement.

46.     Bankruptcy courts consistently defer to a debtor's business judgment on most
business decisions, including the decision to borrow money, unless such decision is arbitrary and
capricious.  See e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789
F.2d 1085, 1088 (4th Cir. 1986) (approving debtor in possession financing necessary to sustain
seasonal business); Ames Dep't Stores, Inc., 115 B.R. at 40 ("[C]ases consistently reflect that the
court's discretion under section 364 is to be utilized on grounds that permit reasonable business
judgment to be exercised so long as the financing agreement does not contain terms that leverage
the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to
benefit a party-in-interest.").

47.     The financing under the DIP Loan and the use of the cash collateral is the sole
means of providing the Debtors with liquidity and thus will enable the Debtors, inter alia, (a) to
minimize disruption to the Debtors' business by paying on-going expenses, (b) preserve and
maximize the value of the Debtors' assets for the benefit of all the Debtors' creditors, (c) avoid
immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees,
and their assets, and (d) permit the Debtors to pursue a plan of reorganization.

HF 11504030v 2 #18887/0001

Pg 20 of 21

## NOTICE

48.     Notice of this Motion has been provided to (i) Office of the United States Trustee, (ii) the attorneys for the Debtors' Prepetition Lender and proposed DIP Lender, (iii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, (iv) the Internal Revenue Service, and (v) the Securities and Exchange Commission, in each case by CM/ECF, facsimile, e-mail, telephone, or overnight courier.  In light of the nature of the relief requested herein, the Debtors submit that no other further notice is necessary.

49.     No previous application for the relief sought herein has bee made to this or any other Court.

WHEREFORE, the Debtors respectfully request the Court (i) to enter an Interim Order substantially in the form annexed hereto as Exhibit A  (a) authorizing the Debtors' use of cash collateral (b) authorizing the Debtors to enter into and borrow under the DIP Loan; (c) granting Victory Park liens and super-priority claims; (d) scheduling a final hearing to consider the relief sought herein on a final basis; (e) granting any other appropriate form of relief; and (ii) immediately following the final hearing, enter a final order on substantially the same terms as the interim order.

HF 11504030v.2 #18887/0001

Dated: New York, New York
June 5, 2017

HERRICK, FEINSTEIN LLP
*Proposed Attorneys for the Debtors and
Debtors in Possession*


By: /s/ Stephen B. Selbst
   Stephen B. Selbst
   Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
hhuynh@herrick.com

HF 11504030v.2 #18887/0001